COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Malveaux, Chaney and White
Argued via videoconference


TRAVIS RYAN BROWN

v.      Record No. 0446-24-3

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION* BY
JUDGE MARY BENNETT MALVEAUX
JULY 29, 2025


FROM THE CIRCUIT COURT OF AUGUSTA COUNTY
Shannon T. Sherrill, Judge

Dana R. Cormier (Dana R. Cormier, P.L.C., on briefs), for appellant.

Jason D. Reed, Senior Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


A jury convicted Travis Ryan Brown ("appellant") of aggravated murder, in violation of

Code § 18.2-31, and felony child abuse or neglect, in violation of Code § 18.2-371.1(A).

Appellant argues on appeal that the trial court erred in admitting social media messages and

denying his motions to strike and set aside the verdict.  For the following reasons, we find no

error and affirm the circuit court's judgment.

## I.  BACKGROUND[1]

"Under familiar principles of appellate review, we will state 'the evidence in the light

most favorable to the Commonwealth, [as] the prevailing party in the trial court, and will accord

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] A portion of the record in this case was sealed, but the appeal necessitates unsealing
certain relevant portions of the record to resolve the issues raised by appellant.  Evidence below
that is necessary to address those issues are included in this opinion.  Consequently, "[t]o the
extent that we mention facts found only in the sealed record, we unseal only those specific facts,
finding them relevant to our decision in this case.  The remainder of the previously sealed record
remains sealed."  *Chenevert v. Commonwealth*, 72 Va. App. 47, 52 n.1 (2020) (quoting *Church*

the Commonwealth the benefit of all reasonable inferences fairly deducible from that evidence.'"

*Bazemore v. Commonwealth*, 82 Va. App. 478, 485 (2024) (alteration in original) (quoting

*Sidney v. Commonwealth*, 280 Va. 517, 520 (2010)).

The Life of K.C.

K.C., the victim, was the daughter of Amanda Arey and William Cuthriell, Jr.  She was

born on December 5, 2017, and Arey described her as a child who was "happy all the time" and

"[l]oved everybody.  Never met a stranger. . . .  She just wanted friends."  Arey's cousin, Daniel

Mullin, who lived with Arey from the time of K.C.'s birth, also described K.C. as "always happy

and smiling."

On October 20, 2020, shortly before K.C.'s third birthday, police arrested Arey for a

probation violation and child protective services ("CPS") took custody of K.C.  CPS determined

that neither Cuthriell nor Arey's sister were suitable placements for K.C., so Arey suggested CPS

contact Arey's friend, Candi Royer.  Royer had recently offered to "keep [K.C.] if [Arey]

couldn't find anyone else to keep her."  Arey had known Royer and her boyfriend, appellant, for

a little more than a year and was aware they were cohabiting.  CPS instituted a diversionary

placement of K.C. with Royer.

During the first two weeks Arey was in jail, she tried to contact K.C. by calling Royer

and appellant on their cell phones, but she "couldn't get anybody to answer."  Beginning in

November 2020, Arey was able to speak with K.C. "at least once every two weeks," but she still

had trouble getting Royer or appellant to take her calls.  When Arey spoke with K.C. at

Christmas, K.C. was crying and Royer told Arey K.C. was sick.  When Arey repeatedly sought

---

*v. Commonwealth*, 71 Va. App. 107, 112 n.1 (2019)).  In addition, we use initials, rather than the minor child's name, to protect their privacy.

to speak with K.C. in January 2021, "there was always one excuse or another." Arey was told K.C. was napping, "[appellant] had her rocking her back to sleep or just different things."

In March 2021, when Royer and appellant informed Arey that their phones had been "cut off," Arey arranged for Cuthriell to provide them with a prepaid phone. But when Arey called that phone repeatedly, no one answered. Eventually, on one occasion, appellant did pick up and told Arey he had left the phone in the car. Appellant said he was at work, and Arey asked if she could call back later and speak to K.C. Appellant replied, "I don't see why not," but that conversation never took place. Neither Royer nor appellant ever answered that phone again. Arey last spoke with her daughter on January 12, 2021.

Cuthriell testified that about a week after K.C. was placed with Royer, he took groceries to appellant's home. He regularly called and texted Royer to try to schedule visits with K.C., but Halloween, Thanksgiving, and K.C.'s birthday passed without Cuthriell being able to see her. Consequently, Cuthriell's relationship with Royer deteriorated, and appellant informed Cuthriell that he "should talk to him from then on." But Cuthriell still was not able to see his daughter. Appellant first offered the COVID-19 pandemic as an excuse, and then claimed CPS "told them not to have any contact with [him]." The last time Cuthriell saw K.C. was in late October 2020, when he took groceries to the home. He testified that when K.C. went to live with appellant and Royer, she was "happy and healthy."

In March 2021, Cuthriell contacted appellant and Royer to tell them he had money to give them for K.C.'s care. Appellant arranged to meet Cuthriell at a gas station, where Cuthriell provided $300 in cash. When Cuthriell asked appellant about K.C., he replied that "she was doing fine." In April or May, 2021, Cuthriell encountered appellant at a local business and asked him about K.C., and appellant replied that "she was doing okay."

Arey continued her attempts to contact appellant and Royer until September 2021, using "[e]very number [she] could think of" and asking friends for contact information. Mullin also reached out to Royer via Facebook. In September 2021, Arey learned that Royer had been reported missing the previous month. She contacted the sheriff's department to report K.C. missing, and an investigation began.

<u>Appellant's Arrest and Police Interviews</u>

Police traced appellant and Royer to a hotel in Pennsylvania, where appellant had rented a room under an assumed name. They arrested appellant, and on September 12, 2021, Investigators Chad Marshall and Ronald Reid of the Augusta County Sheriff's Office interviewed appellant in Pennsylvania. After appellant received a *Miranda* warning,[2] he claimed he "didn't do nothing" in Augusta County. Marshall then told appellant he was there to "find a little girl," and appellant replied, "What girl?" Marshall showed appellant a photograph of K.C., and appellant identified her by name. Asked where she was, appellant said that "social services" had picked her up four or five months previously. He then asked the investigators why they were asking him "about that." Marshall explained that K.C. was missing, and appellant repeated that CPS had picked up K.C. Marshall asked appellant when he had last seen K.C., and he replied, "[w]henever [CPS] picked her up." Asked who had been present during the pickup, appellant stated that he "guess[ed]" Royer was. When Marshall said he had talked to Royer, and that she claimed to have been at work and that appellant had been present at the pickup, appellant terminated the interview.

Investigators Michael Roane and Trevor Rexrode of the Augusta County Sheriff's Office conducted a second interview with appellant on September 19, 2021. Appellant initially reiterated his claim that someone from CPS came to the home and took K.C. away with them.

---

[2] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

When the investigators told appellant that CPS denied picking up K.C., appellant claimed he had not been there at the time and did not know any of the details. He said that the last time he had seen K.C. had been the day before CPS picked her up, which was "sometime" during January 2021.

Appellant told the investigators that K.C. initially adjusted well to living with him and Royer, but then began misbehaving in various ways, including smearing feces on herself. He claimed that on one occasion, he found K.C. choking his daughter. K.C., appellant said, was "almost like possessed."

Rexrode asked appellant how he had handled K.C.'s "behavioral issues" and whether he had "smack[ed] her" or "put her in a time out"; appellant replied that K.C. "liked to be smacked." Asked whether time out was "the most discipline" he had imposed, appellant said that he "tried spanking [K.C.] a couple of times" but that "it did no good." He did, however, acknowledge that he "might have lost [his] temper or something and smacked her." Appellant also told police that K.C. would often "fall" and "just smack her . . . head all the time." He said that he had never before seen a person who would fall without putting their arms out to stop themselves. K.C. would "be walking through the house" and "just [fall]." The investigators asked appellant if he knew of any blood traces they might find from K.C.'s injuries, and appellant told them, "maybe [from] a busted lip" but "nothing of significance." Appellant also made clear to the investigators that neither he nor Royer ever took K.C. to a doctor while she lived with them.

The investigators read to appellant Facebook messages from Royer to him on August 17, 2021, in which Royer stated, "[d]o you lay in bed at night and think about what you did to that little girl? . . . Tell [Southern] ab[out] [K.C.] . . . . Tell her about the brush handle," "the burns," and "the bruising." Appellant responded that police were "reading more into it than what it is."

He explained that the reference to burns described an episode during which K.C. got in the shower on her own and burned herself with hot water.

An hour into the interview, appellant asked the investigators if they could "get [him] a bond" to get him back to Virginia. When Roane asked appellant whether, if they did so, he would tell them "what really happened," appellant asked them to "kill the camera." The investigators said they could not do that, and appellant asked to "go outside" with them. Rexrode later testified that while they were outside the interview room, appellant said that if they could get him back to Augusta County that same day, "he would tell us where [K.C.] was."

After returning to the interview room, appellant admitted that he had "a short temper." Rexrode suggested that when appellant took drugs, it would "turn" him and make him "lose [his] shit," and appellant agreed, stating, "[y]eah. It does. . . . Every time." Appellant said that he thought he needed a "two-year [rehab] program" after getting "fucked up on those drugs a long time ago." He later said that he was "fucked up" on drugs "every day."

Appellant then told the investigators that Royer had "no involvement whatsoever," and that "[i]f I'm gonna burn, I'm gonna burn by myself." The investigators asked appellant if he was willing to tell them where K.C. was, but he replied that he had to "hold that card" of first getting their help to get back to Virginia. After they again asked him to provide K.C.'s location, appellant told the investigators, "[w]hen it's over, when I tell y'all everything, y'all are gonna be like, 'Fuck Travis.'" Appellant then stated, "I didn't kill her," before repeating that K.C. would throw herself down around the house. He said that K.C. "just kept throwing herself down, man, and she just didn't get up one time." Appellant explained that this occurred in the home during January 2021 and that when it happened, K.C. was "gurgling blood from her mouth." Appellant told the investigators he had "tried so hard to pick up the phone" and knew that he "probably should have called," but "just didn't call when [he] should have." Instead, appellant "freaked

- 6 -

out" and "passed out" for "a couple of hours." Appellant did not immediately move K.C.'s body. Rather, after "about a day," he wrapped her in her blanket and put her out in the trash, which was collected and sent to a landfill.

Appellant repeated that he "didn't kill [K.C.]" and that she had "threw herself down, man, did that thing where she smacked her . . . head against the door, man, and just didn't get up." He denied that Royer had been involved and told the investigators, "once it happened, I handled it wrong."

Video recordings of both police interviews were entered into evidence at trial.

The Search of Appellant's Home

Special Agent Arthur Wouters of the Virginia State Police, a forensic specialist, found red stains, later determined to be blood, on the walls and floor of K.C.'s bedroom. Wouters collected samples of the stains, which appeared from less than two feet above the floor to more than six feet above the floor. Subsequent testing by the Virginia Department of Forensic Science determined that the blood samples were more than 60 quadrillion times more likely to be from a biological child of Arey and Cuthriell than from a random Caucasian couple.

Wouters also discovered a looped wire handle wrapped with duct tape. Forensic testing of hairs recovered from the object determined that they, too, were many quadrillion times more likely to be from a biological child of Arey and Cuthriell than from anyone else. Wouters noted that unlike the other bedrooms in the house, the doorknob to K.C.'s bedroom was positioned so the lock was on the outside of the room; thus, if it were locked, "whoever was in the bedroom could not get out."

Additionally, police recovered photos and videos from Royer's phone and appellant's Facebook account.

## Appellant's Motion *in Limine*

Appellant filed a motion *in limine* seeking to prohibit the introduction of statements Royer made to him in a series of Facebook messages. He argued that the contents of these exchanges were inadmissible hearsay.

The trial court denied the motion. It found that the first set of statements, contained in messages dated March 26, 2021, were relevant and admissible to provide context to appellant's responsive statements to Royer. Additionally, since the Commonwealth's theory of the case was that Royer's statements were in fact false, their truth or falsity could not be "relevant for the context that's provided," and thus the statements were not hearsay. The trial court also concluded that Royer's statements contained in messages dated May 1, July 25, and August 17, 2021 were admissible to provide context and as adoptive admissions pursuant to *Lynch v. Commonwealth*, 272 Va. 204 (2006). All of the contested statements were subsequently admitted at trial.

## Expert Testimony at Trial

Dr. Robin Foster, a board-certified pediatric emergency and child abuse and neglect physician, testified at trial as an expert in child abuse. She explained the medical definition of "child torture" as "a severe[,] extreme form of child abuse that . . . occurs over a period of time instead of [in] just one instance." Such conduct requires both physical and psychological abuse, and also frequently involves neglect. Physical abuse would involve either multiple physical assaults against the child or "one protracted, very long assault on the child that has an associated . . . significant long-term bodily injury to the child or mortality." Psychological abuse would entail multiple forms of maltreatment, typically including "isolation," in which the child's caregivers "limit their socialization in terms of going to daycare or going to school or attending functions outside of the home. . . . [F]requently those children are confined to a single space in

- 8 -

their home. They may be locked in their bedroom." Another common form of psychological abuse, according to Dr. Foster, is "spurning," in which the child is "constantly told that they're not loved, they're rejected emotionally by the caretakers" and are "singled out in the family for being the person that is always doing something wrong." Neglect, Dr. Foster opined, frequently involves the "restriction" of the child's "basic needs," including hygiene and care for their hair and nails. And "medical neglect" occurs when caregivers do not timely seek medical care for a child who has suffered "significant injuries . . . [or] malnourishment, starvation, [or] dehydration."

Dr. Foster further explained that the household dynamics in child torture cases are characterized by "all of the caretakers . . . in that household [being] aware of the ongoing torture that the child is experiencing and to some extent participat[ing] in it." The child is "blame[d] for everything that occurs," and frequently "is described as being bad, having behavioral problems, having bad habits that really have forced those caretakers to inflict severe punishments on the child." Often, the caretakers "won't take responsibility for what occurred and then they have very little remorse for what has happened to that child in their care." Dr. Foster agreed that a caretaker describing a three year old as possessed would be consistent with child torture, "in terms of making that child the one that has a problem."

Dr. Foster also noted that child torture involves assaults, which frequently manifest in soft tissue injuries including "bruising from blunt impact trauma forces," "burns from being intentionally burnt," lacerations from being hit with objects, and impact trauma resulting in head injuries and internal abdominal injuries.

Dr. Foster examined photographs and videos of K.C. taken while K.C. lived with appellant and Royer, which were entered into evidence. She first described injuries to K.C. that were apparent in a photograph from November 13, 2020, less than one month after K.C. went to

live with Royer and appellant.  She noted bruising to K.C.'s forehead and upper left eyelid, and an "abrasion or disruption of the skin" on her left chin.  K.C.'s cheek and eyelid injuries were not of a nature to be "expected in toddler age children when they have a normal accidental fall."  The cheek injury in particular was "less common" to occur "unless there is a significant directed impact force."  Dr. Foster also noted that as of November 13, 2020, K.C. was "still sort of . . . bright eyed" and "still [had] chunky cheeks and . . . a lot of hair."  In photos taken only three days later, Dr. Foster noted that some of K.C.'s hair was now missing.

In reviewing a video of K.C. recorded on November 21, 2020, Dr. Foster noted that appellant could be heard "spurn[ing]" K.C., who had "already made an attachment . . . call[ing] them mommy and daddy . . . .  [S]o being told [by appellant] that you're going to be sent somewhere else and not be able to celebrate your birthday and not have Christmas is very emotionally damaging and neglectful to that child."  Foster also noted a new bruise under K.C.'s jaw, and she remarked upon K.C.'s "body habitus" in the video: she was "sitting very still," "constricted down into sort of a small existence," and "very quiet in her responses to questions."

In a later series of photos, Dr. Foster noted "a lot more facial injuries" to K.C., including bruising "demonstrating addition[al] impact trauma," "a ton of abrasions" on her face, and "a lot of soft tissue injuries."  K.C. also was "missing a lot of her hair on the right-hand side of her head," and she had a large, circular abrasion on her face that was in "a very unusual place for kids to injure themselves even when they fall because normally their forehead is what impacts and the soft tissue part of their face is spared."  The abrasion was also larger than would be expected from a fall.  Dr. Foster also noted that K.C.'s head was beginning to appear "relatively big relative to her cheeks and the rest of her body."  She explained that "If you're not getting adequate nutrition or not getting adequate calories or [are] malnourished your head stays stable, but the rest of your body can lose a lot of weight.  And so now [K.C.'s] head looks very large

compared to the rest of her body." K.C.'s arms and legs also appeared "very thin" relative to photos of her from October.

A photo of K.C. taken on Christmas Eve 2020 showed her "in a recumbent position," which Dr. Foster found "important" because K.C. was "not standing up anymore. She's not looking like she's active or engaged. She's in a very passive position." Photos taken on Christmas Day depicted "three circular disruptions of the skin" on one of K.C.'s ears and an additional one on one of her heels. Dr. Foster stated that the size and shape of the "circular disruption[s]" were "concerning" because they potentially indicated cigarette burns rather than abrasions. The ear disruptions also were in a location "that does not usually get injured . . . if you fall against something." The Christmas Day photographs also depicted K.C.'s neck, from which "[a]ll the subcutaneous fat [was] gone."

Examining a subsequent photo of K.C.'s mouth, Dr. Foster noted an abrasion to the top lip and two "ulcerative blistered lesions on the inside of [the lower] lip" that were "what a burn intraorally would look like in a child that age." Dr. Foster also reviewed a video and extracted still images that depicted K.C. in the bathtub on January 12, 2021. She noted that "for a long period of time in the video" K.C. was "hunched over and crouched over . . . even though she was being asked to stand up repetitively." This raised the "concern not only . . . that she's afraid, but also that at this point in time based on the appearance of her body she's probably weak too in terms of her body habitus looking extremely thin." Each of K.C.'s vertebrae and the "spinal processes" sticking up from them were visible. In a toddler, Dr. Foster stated, the spinal processes are normally "covered up with subcutaneous fat. But in the absence of that fat from malnutrition, starvation, then those vertabra[e] start appearing with these bony prominences." Dr. Foster also noted "linear marks" visible on K.C.'s legs that appeared to be lacerations. Even though K.C. was in a bathtub, she did not appear to have been bathed. When K.C. finally stood

up, it was possible to "see lots of marks on her," including abrasions under her nose, marks across the right side of her chin, marks on her abdomen, and "a lot of discoloration" on the inside of her left thigh, which could be either feces or "bruising from blunt impact trauma."

When considering the bathtub video and still photos, Dr. Foster repeatedly commented on the dark discoloration and swelling of K.C.'s feet. She stated that this could

> reflect sort of that end stage process of life. So [K.C.] appears very unhealthy . . . . She appears very thin and malnourished. She appears very weak. And so she's been leaning over and crouched over for a long period of time and in that position, just like you see sometimes in really elderly people, the blood is having a hard time maybe getting out of her feet and coming back up and recirculating into her body because she's not well hydrated, she's not well fed, she may have a very low blood pressure at this point in time. And so that—those fluids start to pool in her feet.

Viewing another photo depicting K.C.'s back, Dr. Foster noted "a very distinct curve . . . those sort of loop marks or curvilinear marks are the most common distinct morphology that child physical abuse soft tissue injury cases have," because of "something being used, like a cable cord or a belt or something to hit the child and it leaves that loop mark."

Dr. Foster also compared a photo of K.C. taken the day after she arrived at appellant's home in late October 2020 with a photo taken on January 12, 2021. The October 2020 photo depicted "a normal healthy, well developed, well nourished toddler" with "plenty of subcutaneous fat" and "thick healthy hair." K.C. appeared "happy and engaged and developmentally appropriate in what she's doing." By contrast, in the January 2021 photo, "even though it's less than three months later, it's not even recognizable as the same child." K.C. had "lost a significant amount of weight off her trunk." She exhibited thin extremities and "bony prominences on her shoulder blades," swollen and purplish feet, and "had her hair missing in chunks on her scalp." K.C. would not make eye contact with the camera. In that state, K.C. was more susceptible to sepsis or infections from inadequate nourishment, cardiovascular

- 12 -

collapse from dehydration, and death from lack of certain minerals necessary "to make all of her cells still function."

Asked whether a child of K.C.'s size could "throw her head against a door or a door frame in a way that could result in her death," Dr. Foster responded, "Just physically hitting the door with her head? No. No." Asked for her ultimate medical opinion, Dr. Foster opined that there was evidence of child physical abuse, child neglect, and psychological abuse, which "definitively . . . fits the definition of child torture because it's over a period of time." There had been "a distinct obvious deterioration in [K.C.'s] physical well being" over a period of time and "no evidence that medical care was ever sought for any of these issues and it ultimately resulted in a fatality." Asked on redirect whether, if "at some point after all this injuring of [K.C.] and all this other stuff, if they had brought her at some point to the emergency department, is it possible that they could have saved [K.C.]," Dr. Foster replied, "Yes, absolutely."

### Additional Events at Trial

Brittany Southern testified that she met appellant in July 2021 and the two soon began a romantic relationship. She said that appellant never mentioned K.C., but that she asked him about her after seeing a Facebook message in which Royer mentioned K.C. and told appellant, "once they find out what you did to her . . . , you're going to go to prison for the rest of your life." Appellant "got mad and stormed off" and threw Southern's phone at her.

Southern also testified that once, while she and appellant were at a restaurant, he said he had to tell her "a big secret" that only Royer knew about. Appellant then told Southern that "he had murdered somebody." Southern asked appellant to explain what he was talking about, but appellant refused and told Southern only that "it was close to home, it was local." Later, appellant threatened several times to kill Southern if she "t[old] on him or turn[ed] on him."

- 13 -

Appellant moved to strike the evidence at the close of the Commonwealth's case-in-chief. The trial court denied the motion. The jury convicted appellant of aggravated murder and felony child abuse or neglect. Appellant moved to set aside the verdict. Following argument on the matter, the trial court denied the motion.

This appeal followed.

## II. ANALYSIS

### A. Admission of Social Media Messages

Appellant argues that the trial court erred by admitting the social media messages dated March 26, May 1, July 25, and August 17, 2021. He contends that each set of communications comprised inadmissible hearsay.

"On appellate review of issues involving the admissibility of evidence, the Court views the evidence in the light most favorable to the Commonwealth as the party who prevailed below.'" *Bazemore*, 82 Va. App. at 495 (quoting *Haas v. Commonwealth*, 71 Va. App. 1, 5 n.1 (2019), *aff'd in part and vacated in part*, 299 Va. 465 (2021)). "The admissibility of evidence is within the broad discretion of the trial court, and a ruling will not be disturbed on appeal in the absence of an abuse of discretion." *Id.* (quoting *Wolfe v. Commonwealth*, 67 Va. App. 97, 106 (2016)). "This standard, if nothing else, means that the trial judge's 'ruling will not be reversed simply because an appellate court disagrees.'" *Turner v. Commonwealth*, 65 Va. App. 312, 327 (2015) (quoting *Thomas v. Commonwealth*, 44 Va. App. 741, 753, *adopted upon reh'g en banc*, 45 Va. App. 811 (2005)). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Id.* (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)). "'[B]y definition,' however, a trial court 'abuses its discretion when it makes an error of law.'" *Curry v. Commonwealth*, 84 Va. App. 339, 349 (2025) (alteration in original) (quoting *Coffman v. Commonwealth*, 67 Va. App. 163, 166 (2017)).

"Hearsay is 'a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.'" *Atkins v. Commonwealth*, 68 Va. App. 1, 7 (2017) (quoting Va. R. Evid. 2:801(c)). "[I]f a statement is not offered for its truth, it is not excludable as testimonial hearsay because it is not hearsay at all." *Curry*, 84 Va. App. at 352 (alteration in original) (quoting *Bennett v. Commonwealth*, 69 Va. App. 475, 489 (2018)). "If evidence is hearsay, '[it] is inadmissible unless it falls within one of the recognized exceptions' to the rule against hearsay." *Atkins*, 68 Va. App. at 7-8 (alteration in original) (quoting *Robinson v. Commonwealth*, 258 Va. 3, 6 (1999)); *see also* Va. R. Evid. 2:802. "[A]n out-of-court statement by a criminal defendant, if relevant, is admissible as a party admission, under an exception to the rule against hearsay." *Atkins*, 68 Va. App. at 8 (alteration in original) (quoting *Bloom v. Commonwealth*, 262 Va. 814, 820 (2001)); *see also* Va. R. Evid. 2:803(0)(B). And the law further "makes clear that '[w]ords which constitute a question or accusation that result in a party admission are not barred by the hearsay evidence rule.'" *Jones v. Commonwealth*, 71 Va. App. 597, 605 (2020) (alteration in original) (quoting *Swain v. Commonwealth*, 28 Va. App. 555, 560 (1998)). Additionally, because a statement not offered for its truth is not excludible as testimonial hearsay, "words offered solely to to give context to party admissions are not hearsay and are admissible." *Curry*, 84 Va. App. at 352 (quoting *Swain*, 28 Va. App. at 560).

1. The March 26, 2021 Messages

On March 26, 2021, Mullin messaged Royer to say that Arey "wants to talk to [K.C.] it's been 6 weeks she said this is ridiculous you want money from [Cuthriell] again you need to give me a working phone number asap!" Royer replied that she had messaged Arey "several times" requesting K.C.'s birth certificate, social security number, and other information, and had not "received anything." She further stated to Mullin that

> [i]ts their responsibility to take care of their child considering they
> still receive food stamps for her and [Arey] is in jail collecting

- 15 -

> unemployment. I've had [K.C.] since Oct and they have gave very little help. . . . [I] don't owe them a damn thing. Maybe if all this effort was put toward loving and caring for her from the beginning we wouldn't be in this situation.

Royer sent a screen capture of this exchange to appellant, and he replied by stating, "baby that's exactly what needed to be said a long time ago. Fuck them[.] And tell them if they have a problem with anything else to call me. They didn't reply to that?" When Royer responded, "[n]o," appellant told her, "[t]ell them also if [K.C.] was in states care they wouldn't be able to talk to her anyways and that we was told [Arey] wasn't allowed to contact [K.C.] until all court cases were finalized."

Appellant acknowledges that his response to Royer's screen capture of her exchange with Mullin "is perhaps admissible as [appellant's] own statement or admission." But he nonetheless argues that the trial court erred by admitting the Royer-Mullin exchange "as non-hearsay on the grounds that [it] was not admitted for the truth of the matter, but to give context to [appellant's] statement." Appellant contends that this was error because his response to Royer did not need the Royer-Mullin exchange to provide context, since his response was "sufficiently clear" that it "need[ed] no purported non-hearsay to explain it." And "[b]eing unnecessary for context," appellant argues, the Royer-Mullin exchange lacked relevance and was thus inadmissible.[3]

"Evidence is relevant if it has 'any tendency to make the existence of any fact in issue more probable or less probable than it would be without the evidence.'" *Jones v. Commonwealth*, 71 Va. App. 70, 88 (2019) (quoting Va. R. Evid. 2:401). "Generally, '[a]ll relevant evidence is admissible' unless provided otherwise by the rules." *Id.* (alteration in

---

[3] Appellant also contends that this exchange was irrelevant because although the Commonwealth argued below that K.C. was already dead "and the . . . exchange was evidence of a ruse to conceal the death," K.C. could still have been alive on March 26. Thus, the exchange "has no probative value to the issues of [K.C.'s] murder[,] the state of mind of the murdere[r] or the perpetrator of the abuse." But given appellant's acknowledgement to police that K.C. died in January 2021 and he disposed of her body soon after, we need not address this argument.

original) (quoting Va. R. Evid. 2:402). And "[t]he scope of relevant evidence in Virginia is quite broad, as '[e]very fact, however remote or insignificant, that tends to establish the probability or improbability of a fact in issue is relevant.'" *Id.* at 88-89 (second alteration in original) (quoting *Commonwealth v. Proffitt*, 292 Va. 626, 634 (2016)). Stated differently, unless the rules of evidence provide otherwise, evidence is admissible if "its proponent has laid a proper foundation from which the jury might conclude it is relevant to the proponent's theory of the case." *Cousins v. Commonwealth*, 56 Va. App. 257, 264 (2010).

We disagree with appellant's contention. Here, the Commonwealth's theory of the case was that K.C. had been dead for weeks when this exchange occurred, appellant had been a party responsible for her death, and appellant sought to prevent anyone from learning of the death or his involvement in it. When Mullin messaged Royer seeking a way to contact K.C., Royer responded with an assertion that K.C.'s family had been derelict in providing for her well-being. When Royer then sent a screen capture of that exchange to appellant, he replied that her statement was "exactly what needed to be said a long time ago." He further said Royer should tell "them if they have a problem with anything else to call me" and to "[t]ell them also if [K.C.] was in states care they wouldn't be able to talk to her anyways." Contrary to appellant's argument, these statements, taken in isolation from the Royer-Mullin exchange, were not "sufficiently clear" enough to "need no [context] to explain [them]." Absent the prior exchange, it would not be possible to know what subject appellant was referring to when he said that something "needed to be said a long time ago," or to whom he believed it needed to be said. Nor would it be possible to understand whom appellant was referring to when speaking of "them." This context provided by the Royer-Mullin exchange thus illuminates both the subject matter appellant wanted addressed and the addressee, which went directly to the Commonwealth's theory of the case: that K.C. was already dead on March 26, 2021, and that appellant, a guilty

- 17 -

party, sought to conceal her death and his involvement in it by misleading K.C.'s loved ones. As such, the Royer-Mullin exchange was relevant, and thus admissible, to provide context to appellant's statements to Royer.

2. The May 1, July 25, and August 17, 2021 Facebook Messages

On May 1, 2021, Royer and appellant exchanged the following messages via Facebook:

ROYER: I promise you on everything that I would t lie for you about [K.C.]. You know what you did Travis. Thats on you. Im out of it. I. Talking to my dad about it toight

APPELLANT: just know the gun shot your about to hear is a bullet going thru my head

On July 25, 2021, the two exchanged additional messages:

ROYER: Trust me I took care of my back . . . did u take care of urs

APPELLANT: ????

ROYER: Id hate for them to find them videos you had on your computer

APPELLANT: I bet not

ROYER: Oh I did cause I knew I did t have yo[u]. You never had my bac[k]

APPELLANT: Ok

ROYER: Its me myself and I

APPELLANT: We see who is trying to lock who up . . . so who has who back
U sound so stupid saying that shit right after trying to get me arreste[d]

 . . . .

ROYER: U nless you want a murder charge id shut up

APPELLANT: Yeah [Royer] ur insane I won't kill u

- 18 -

On August 17, 2021, another exchange occurred:[4]

> ROYER:  I hope you rot in hell.  You are a poor excuse for a person.  Do you lay in bed at night and think about what you did to that little girl?  I do. It's eating me alive. . . .
> Doors [sic] your soul mate know what you've done?  Did you tell her? . . . Tell her ab[out] [K.C.] . . . Tell her about the brush handle . . .
> The burns
> The bruising

> APPELLANT:  [Royer] ur fucking up bad.

Appellant challenges the admission of these messages on the grounds that none of them "meet the *Lynch* test for the admission of adoptive or tacit admissions" by a defendant, and thus the trial court erred by admitting them.  He contends that the statements were simply too "vague," "cryptic," "ambiguous," or "*non sequitur*" to satisfy the required standard.  We disagree.

In *Knight v. Commonwealth*, 196 Va. 433, 436 (1954), our Supreme Court noted

> [t]he general rule that when a statement accusing one of the commission of an offense is made in his presence and hearing and is not denied or contradicted by him, both the statement and the fact of his failure to deny are admissible in a criminal proceeding against him, as evidence of his acquiescence in its truth, . . . based on the theory that the natural reaction of one accused of a crime is to deny the accusation if it is unjust or untrue.

Further developing this principle, the Court explained that while "[t]he *hearsay character of the incriminating statement made to the accused would render it inadmissible*," this inadmissibility was negated by the "fact that the statement is not offered in evidence as proof of a fact asserted but as a predicate to the showing of the reaction of the accused thereto."  *Id.* (quoting 20

---

[4] At this time, Brittany Southern was dating appellant and Royer was "blocking" appellant on Facebook.  Appellant would therefore use Southern's Facebook account to contact Royer.  Appellant and Royer's August 17, 2021 messages thus occurred between the accounts of Southern and Royer, as appellant acknowledges on brief.

- 19 -

Am. Jur., *Evidence*, § 570, pp. 483-84). Nevertheless, the Court advised, "[*c*]*aution must be exercised*" in application of the principle. *Id.* Subsequently, in *Lynch*, the Court noted that where a "tacit admission[], or admission[] by silence" is concerned, to be admissible, the Commonwealth must prove by a preponderance of the evidence certain predicate facts: "that (1) the defendant must have heard the incriminating statements, (2) he must have understood that they accused him of complicity in a crime, (3) the circumstances afforded him a fair opportunity to deny or object, and (4) the circumstances would naturally call for a reply." *Lynch*, 272 Va. at 209.

Appellant contends that his May 1, 2021 statement to Royer—"Just know the gun shot your about to hear is a bullet going thru my head"—fails to satisfy the first two prongs of the *Lynch* test, because "it is not evident that [he] heard or saw the incriminating and accusatory statement" or that he "understood that [Royer] was accusing him of a crime." But these arguments are without merit. Royer's preceding statements that she would not lie for appellant about K.C., appellant "knew what [he] did" in reference to K.C., and she was imminently about to talk with her father about it clearly conveyed an accusation related to K.C. And appellant's reply, which threatened suicide, was clearly responsive to Royer's message, as there were no intervening messages between the parties to obscure what subject matter appellant was responding to. Accordingly, the trial court did not err in finding sufficient evidence that the May 1, 2021 Facebook messages were admissible as adoptive admissions pursuant to *Lynch*.

Appellant next argues that the July 25, 2021 messages were inadmissible as adoptive admissions under *Lynch*. He contends that Royer's statement asking if he had "tak[en] care" of his back was too "vague and ambiguous" to communicate an incriminating or accusatory threat to him, and his immediate response of question marks failed to demonstrate that he understood he had been accused of complicity in a crime. Appellant likewise argues that Royer's statement,

- 20 -

"[u]nless you want a murder charge id shut up," was too vague and ambiguous to communicate an accusation to him and that his response that he would not kill her "suggests that he did *not* believe the statement to be incriminating or accusatory."[5]

These arguments are meritless. Although appellant initially responded to Royer's first statement asking whether he had "tak[en] care of [his] back" with a string of question marks, he further responded one minute later by stating, "[w]e see who is trying to lock who up . . . so who has who back. U sound so stupid saying that shit right after trying to get me arreste[d]." It is evident from the full context of appellant's exchange with Royer that appellant understood Royer's comment about "tak[ing] care of [his] back" as an accusation of complicity in a crime, given that he responded by questioning who was trying to "lock . . . up" whom and accusing Royer of trying to get him arrested. And Royer telling appellant, "[u]nless you want a murder charge id shut up" was a threat containing a clear accusation of complicity in a crime, to which appellant's response that Royer was "insane" demonstrated his awareness that she was leveling a serious criminal accusation against him.

Lastly, appellant contends that his August 17, 2021 Facebook exchanges with Royer were not admissible as adoptive admissions. He argues that there was no evidence that he ever saw Royer's messages stating, "I hope you rot in hell. . . . Do you lay in bed at night and think about what you did to that little girl? I do. It's eating me alive," implying that this is so because

---

[5] Appellant further argues that Royer and appellant's exchange about "them" finding files on his computer was "too vague and ambiguous to establish the requisite elements of the *Lynch* test." But appellant does not develop any specific argument as to the exchange's insufficiency beyond his bald assertion. Accordingly, appellant's argument with respect to this specific portion of his July 25, 2021 Facebook exchange with Royer is waived. *See* Rule 5A:20(e); *Bartley v. Commonwealth*, 67 Va. App. 740, 746 (2017) (applying Rule 5A:20(e) to find waiver and holding it is "not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived" (quoting *Sneed v. Bd. of Prof. Resp. of the Sup. Ct. of Tenn.*, 301 S.W.3d 603, 615 (Tenn. 2010))).

appellant did not immediately respond. Thus, appellant contends, this portion of the exchange failed to satisfy the first prong of the *Lynch* test. He further argues that the "statements to which [he] did respond," asking if he had told Southern "about the brush handle," "[t]he burns," and "[t]he bruising," were "not necessarily incriminating or accusatory" as "separate statement[s]," and that it was "not evident whether the statements [were] connected." Accordingly, appellant contends, his response that Royer was "fucking up bad" did not satisfy the second prong of the *Lynch* test by demonstrating he understood he had been accused of complicity in a crime.

As with appellant's previous arguments, we find no merit here. Appellant seeks to take discreet statements from his full exchange with Royer in isolation, in order to argue that the evidence did not sufficiently demonstrate that appellant saw and understood that he was being accused of complicity in a crime. But considering the totality of the exchange, it is clear that Royer was accusing appellant of serious offenses relating to K.C. and that appellant understood this. Regardless of various asides and interjections by the parties, Royer expressed a consistent message throughout her exchange with appellant. She expressed hope for the damnation of his soul, asked him if his conscience troubled him about what he had done to K.C., asked him if he had told Southern what he had done to K.C., and in that context then specifically asked appellant if he had told Southern about burns, bruising, and a brush handle. Appellant replied to this chain of accusations by attacking Royer, stating that she was "fucking up bad." When these communications are viewed in their entirety, as they must be, it is evident that in the August 17, 2021 exchange, appellant was aware of Royer's incriminating statements and understood that she was accusing him of complicity in crimes involving K.C.

For the foregoing reasons, we find no error by the trial court in denying appellant's motion *in limine* and admitting the social media messages at issue.

B.  Sufficiency of the Evidence

Appellant argues that the trial court erred in denying his motions to strike and set aside the verdict because the evidence of felony child abuse and aggravated murder was insufficient to sustain his convictions.  We disagree.

Motions to strike and motions to set aside a verdict are both means of contesting the sufficiency of the evidence.  *SuperValu, Inc. v. Johnson*, 276 Va. 356, 369 (2008).  "When faced with 'a challenge to the sufficiency of the evidence, we review the evidence in the light most favorable to the prevailing party, including any inferences the factfinder may reasonably have drawn from the facts proved.'"  *King v. Commonwealth*, __ Va. __, __ (Oct. 24, 2024) (quoting *Smith v. Commonwealth*, 282 Va. 449, 453 (2011)).  We "afford[] the highest degree of appellate deference to the facts as decided by the initial factfinder," a "principle [that] applies with 'equal force' to bench trials and jury trials alike."  *Durham v. Commonwealth*, __ Va. __, __ (Aug. 1, 2024) (citation omitted) (quoting *Dietz v. Commonwealth*, 294 Va. 123, 132 (2017)).  "Further, this Court will not replace the ultimate judgment of the factfinder with its own."  *Id.*  The "appellate court does not 'ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.'  Rather, the relevant question is whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *Commonwealth v. Moseley*, 293 Va. 455, 462-63 (2017) (citation omitted) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)).  "In applying this standard of review, we eschew the divide-and-conquer approach, which examines each incriminating fact in isolation, finds it singularly insufficient, and then concludes that the sum of these facts can never be sufficient.  Instead, in an appellate sufficiency review, the evidence is 'considered as a whole.'"  *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (quoting *Stamper v. Commonwealth*, 220 Va. 260, 273 (1979)).  Based on these principles, "[a]

conviction will not be disturbed on appeal unless the judgment is plainly wrong or without evidence to support it." *Durham*, __ Va. at __.

Additionally, "[o]ur inquiry does not distinguish between direct and circumstantial evidence, as the fact finder itself 'is entitled to consider all of the evidence, without distinction, in reaching its determination.'" *Moseley*, 293 Va. at 463 (quoting *Commonwealth v. Hudson*, 265 Va. 505, 513 (2003)). "[C]ircumstantial evidence is competent and is entitled to as much weight as direct evidence provided that the circumstantial evidence is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (alteration in original) (quoting *Dowden v. Commonwealth*, 260 Va. 459, 468 (2000)). "And the hypotheses which must be reasonably excluded are those which flow from the evidence itself, and not from the imagination of defendant's counsel." *Id.* (quoting *Turner v. Commonwealth*, 218 Va. 141, 148 (1977)). "Indeed, in some cases circumstantial evidence may be the only type of evidence which can possibly be produced." *Barney*, 302 Va. at 98 (quoting *Pijor*, 294 Va. at 512). "And '[w]hile no single piece of evidence may be sufficient, the combined force of many concurrent and related circumstances . . . may lead a reasonable mind irresistibly to a conclusion.'" *Moseley*, 293 Va. at 463 (alterations in original) (quoting *Muhammad v. Commonwealth*, 269 Va. 451, 479 (2005)).

### 1. Sufficiency of the Evidence of Felony Child Abuse or Neglect

Code § 18.2-371.1(A) provides, in pertinent part, that

> [a]ny parent, guardian, or other person responsible for the care of a child under the age of 18 who by willful act or willful omission or refusal to provide any necessary care for the child's health causes or permits serious injury to the life or health of such child is guilty of a Class 4 felony.

a. Appellant's Responsibility for K.C.'s Care

Appellant first argues that the trial court erred in denying his motion to strike and set aside the verdict of felony child abuse because the evidence was insufficient to prove he was a "person responsible for the care" of K.C. He contends that Arey "directly entrusted only . . . Royer" with K.C.'s care and that the evidence "does not establish that [he] ever assumed responsibility for [K.C.'s] care."

Here, however, the dispositive issue is not whether Arey "entrusted" only Royer with K.C.'s care, but whether, regardless of any such entrustment, appellant assumed responsibility for K.C.'s care pursuant to Code § 18.2-371.1(A).[6] In *Snow v. Commonwealth*, 33 Va. App. 766 (2000), we held that under the plain language of that subsection, a person may unilaterally assume responsibility for the care of a child; that is, "one may become a person 'responsible for the care of a child' by a voluntary course of conduct and without explicit parental delegation of supervisory responsibility or court order." *Id.* at 773 (quoting Code § 18.2-371.1(A)); *cf. Hutton v. Commonwealth*, 66 Va. App. 714, 724 (2016) (noting that "[t]he child abuse statute, Code § 18.2-371.1, requires only that the Commonwealth prove a defendant was 'responsible for the care of a child,' in contrast to the 'custodial or supervisory relationship' that Code § 18.2-370.1(A) requires"). Additionally, nothing in the language of Code § 18.2-371.1(A) "conveys that an individual cannot have joint responsibility with another individual for the child,

---

[6] We note that appellant does not define the term "entrusted" as used in his brief, and he offers no explanation of any putative legal significance of "entrust[ing]" a child to someone. And while not dispositive, we also note that appellant's argument that Arey "entrusted" only Royer with K.C.'s care is contrary to the evidence. Arey testified that at the time she suggested Royer as someone who could "keep [K.C.]," she had known appellant and Royer for about a year and was aware they were in a relationship and cohabiting. And once Arey was in jail, she sought to contact K.C. through both appellant and Royer. Viewed in the light most favorable to the Commonwealth, this evidence demonstrates that Arey understood K.C. would be in the care of both appellant and Royer while K.C. was living with them.

or that an individual cannot be responsible if a parent or guardian is also present at the time of the child's injury." *Carrington v. Commonwealth*, 59 Va. App. 614, 621 (2012).

Applying this precedent, we hold that the evidence was sufficient to prove that appellant engaged in a voluntary course of conduct that made him a person responsible for K.C.'s care. K.C. was living in appellant's home. He had possession of the prepaid phone provided to him and Royer to facilitate contact between K.C. and Arey. On one occasion, when Arey called to check on K.C., she was told that K.C. was being rocked back to sleep by appellant. When the relationship between Cuthriell and Royer deteriorated, appellant told Cuthriell that he "should talk to him from then on" about K.C. Additionally, in a November 21, 2020 video, K.C. referred to appellant and Royer as mommy and daddy, and appellant told her that she would be sent somewhere else to live and would not be able to celebrate her birthday or Christmas. Lastly, throughout his September 19, 2021 police interview, appellant acknowledged that he had disciplined K.C. and otherwise attempted to manage her behavior. This evidence, in its totality, was sufficient to prove that appellant was a "person responsible for the care" of K.C. under Code § 18.2-371.1(A).

### b. Criminal Agency

Appellant next argues that the trial court erred in denying his motions to strike and set aside the verdict because the evidence was insufficient to prove he was "the criminal agent responsible for the physical abuse that [K.C.] suffered as depicted [in] the photos and videos." He contends that neither those photos and videos, nor the social media exchanges between him and Royer, were "[]adequate to establish that [he] abused [K.C.]."

In pertinent part, Code § 18.2-371.1(A) provides that a person responsible for the care of a child "who by willful act or willful omission or refusal to provide any necessary care for the child's health causes or permits serious injury to the life or health of such child" is guilty of a

felony. The subsection also defines "serious injury" as "includ[ing] but . . . not limited to (i) disfigurement, (ii) a fracture, (iii) a severe burn or laceration, (iv) mutilation, (v) maiming, (vi) forced ingestion of dangerous substances, and (vii) life-threatening internal injuries." *Id.*

We need not address the merits of appellant's argument that the evidence failed to prove he was the willful actor responsible for K.C.'s physical abuse, because the statute also criminalizes "refusal to provide any necessary care for the child's health" that "permits serious injury to the life" of the child. *Id.* Appellant does not contest the sufficiency of the evidence to convict him under this provision of the statute, and we conclude that a reasonable fact-finder could have found the evidence of failure to provide necessary care more than sufficient.[7] *See Perry v. Commonwealth*, 280 Va. 572, 582 (2010) (noting that an appellate court may affirm a trial court's judgment on a "*ground*[] . . . *apparent from the record*" (quoting *MM v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 536 (4th Cir. 2002))); *Robert & Bertha Robinson Fam., LLC v. Allen*, 295 Va. 130, 141 (2018) ("We recognize that an 'appellee is free to defend its judgment on any ground' supported by the record, 'whether or not that ground was relied upon, rejected, or even considered by the [circuit] court' so long as additional factual findings are unnecessary." (alteration in original) (quoting *Perry*, 280 Va. at 581)).

Here, in addition to the photographic and video evidence that depicted a steady decline in K.C.'s health while she lived with appellant,[8] the jury heard the expert medical testimony of Dr. Foster which reinforced that K.C. was malnourished and gravely ill by January 2021. Yet appellant repeatedly made clear to police that he never took K.C. to the doctor, and Dr. Foster

---

[7] Appellant's indictment for a violation of Code § 18.2-371.1(A) included the "necessary care" language and the pertinent jury instruction also included that language. The Commonwealth repeatedly addressed the failure to provide medical care in its closing argument.

[8] Appellant acknowledges on brief that "[t]he photos and videos which investigators discovered on . . . Royer's cellphone clearly depict [K.C.'s] deteriorating condition from October 20, 2020, until January 12, 2020."

opined that there was "no evidence that medical care was ever sought for any of [K.C.'s] issues." Dr. Foster also opined that K.C.'s life "absolutely" could have been saved if appellant or Royer had obtained emergency medical care for her. And appellant himself told police that when K.C. suffered her final injury, and was "gurgling blood from her mouth," he "handled it wrong" and "just didn't call when [he] should have"; he knew that he "probably should have called," but he did not call for help. From this evidence, the jury was entitled to reasonably conclude that appellant refused to provide necessary care for K.C.'s health and that that failure caused or permitted serious injury to K.C.'s life.

Because the evidence was sufficient for a rational trier of fact to find that appellant was a person responsible for K.C.'s care, and that he refused to provide necessary care for K.C.'s health, and thus caused or permitted serious injury to her life, the jury did not err in convicting appellant of felony child abuse or neglect, in violation of Code § 18.2-371.1(A). And thus the trial court did not err in denying appellant's motions to strike and set aside the verdict respecting that offense.

### 2. Sufficiency of the Evidence of Aggravated Murder

Code § 18.2-31(A)(12) provides that "[t]he willful, deliberate, and premeditated killing of a person under the age of 14 by a person age 21 or older" constitutes aggravated murder. Appellant contends that the trial court erred in denying his motions to strike and set aside the verdict of aggravated murder because the evidence was insufficient to prove he "was the criminal agent who killed [K.C.]" or to establish his "specific, premeditated intent to kill." We disagree.

#### a. Criminal Agency

Appellant argues that "the evidence creates only a strong suspicion that he was the criminal agent in [K.C.'s] death" and does not "exclude the reasonable hypothesis that someone other than [appellant] killed [K.C.]" Appellant contends that based on "the greater weight of the

- 28 -

evidence," Royer was that person. As support for his argument, appellant notes that the video and photographic evidence of K.C.'s mistreatment was found on Royer's phone and that except for the November 11, 2020 video, appellant did not appear in any of the photos or videos and "there is no indication that he was even in the home" when they were taken. He disputes that the messages he exchanged with Royer provided any circumstantial evidence to establish his identity as the killer, contending that their contents were either too "cryptic" to be read as accusations of murder, or that they are "equally plausibl[y]" mere accusations of abuse. And appellant also maintains that while his statements to police were "certainly suspicious," they were "woefully inadequate to incriminate him in [K.C.'s] killing."

As an initial matter, we note that even assuming arguendo Royer was *a* killer of K.C., that fact would not exclude that appellant was also liable as a killer of the child under Code § 18.2-31. "It is well-established that in felony cases," a "'principal in the first degree is the actual perpetrator of the crime,'" and it is "beyond dispute" that "there may be more than one principal in the first degree for a particular offense." *Muhammad*, 269 Va. at 482 (quoting *Jones v. Commonwealth*, 208 Va. 370, 372 (1967)); *see also Coppola v. Commonwealth*, 220 Va. 243, 256-57 (1979) (holding that both defendant and another, who jointly participated in a fatal beating, were subject to conviction for capital (now aggravated) murder under Code § 18.2-31); *cf. Remington v. Commonwealth*, 262 Va. 333, 350 (2001) (affirming denial of motion to strike based on contention that only one killer could be convicted under the statute, where the evidence established that both defendant and another "jointly participated in [a] fatal stabbing"); *cf. Strickler v. Commonwealth*, 241 Va. 482, 493-95 (1991) (affirming grant of jury instruction providing for conviction under the statute if the evidence proved defendant "jointly participated in the fatal beating"). Accordingly, while the Commonwealth was required to prove that

- 29 -

appellant killed K.C. to convict him for a violation of Code § 18.2-31(A)(12), it did not have to exclude the hypothesis that Royer may also have been a party to the killing.

Turning to appellant's specific arguments regarding the evidence that he killed K.C., we find them meritless. That appellant did not appear in the photos found on Royer's phone, and appeared in only one of the videos, does not support finding that he was unaware of and did not participate in K.C.'s mistreatment that was happening in his own home. Dr. Foster's testimony indicated that in the one video appellant participated in, on November 21, 2020, his verbal interactions with K.C. constituted "spurn[ing]," which Dr. Foster noted is a common form of the psychological abuse that in part comprises child torture. This evidence alone was sufficient for the jury to conclude that appellant was aware of and participated in K.C.'s mistreatment. But Dr. Foster also explained that in child torture cases, physical abuse pairs with psychological abuse, and that the household dynamics in such cases are characterized by "all of the caretakers . . . in that household [being] aware of the ongoing torture that the child is experiencing and to some extent participat[ing] in it." Based on this testimony, the jury could reasonably infer from appellant's participation in the psychological component of K.C.'s torture that he also participated in the associated physical component. Thus, contrary to appellant's contention, the photographic and video evidence recovered from Royer's phone did provide circumstantial evidence that appellant was not only aware of, but also participated in, K.C.'s physical mistreatment.

The social media messages appellant exchanged with Royer likewise provided circumstantial evidence to establish his identity as the killer. Appellant's statements to Royer on March 26, 2021 demonstrated that appellant, who later told police that K.C. had died that January, sought to convey to K.C.'s family deceitful misrepresentations that she was still alive. The jury could reasonably infer that appellant intended this deception to conceal his guilt for

killing K.C. *See Rams v. Commonwealth*, 70 Va. App. 12, 27 (2019) (noting, in holding that the circumstantial evidence was sufficient to convict defendant for capital (now aggravated) murder in violation of Code § 18.2-31, that "in drawing inferences from the evidence, the fact finder may conclude regarding even a non-testifying defendant that his false statements establish that he has lied to conceal his guilt"). And, as noted above, appellant's responses to Royer's messages on May 1, July 25, and August 17, 2021 constituted appellant's adoptive admissions. Contrary to appellant's contention, the contents of these messages were not too "cryptic" to be read as accusations of murder, and the jury could reasonably infer that they did refer to appellant murdering K.C. rather than merely abusing her. *Cf. Vasquez v. Commonwealth*, 291 Va. 232, 250 (2016) (noting that a fact-finder "cannot 'arbitrarily' choose, as between two equally plausible interpretations of a fact, one that incriminates the defendant," but that "[t]he choice becomes arbitrary . . . only when no rational factfinder could believe the incriminating interpretation of the evidence and disbelieve the exculpatory one" (quoting *Dixon v. Commonwealth*, 162 Va. 798, 803 (1934))).

Lastly, appellant's statements to police were not "woefully inadequate to incriminate him in [K.C.'s] killing"—in fact, they were quite the opposite. Appellant first insisted to police that K.C. had been picked up from his home by "social services" months before his arrest. He repeated this account multiple times throughout his first interview, on September 12, 2021, and maintained it during the initial portion of his September 19, 2021 interview, when he also insisted K.C. had been picked up "sometime" during January 2021. Appellant later offered to tell police "what really happened" and stated that he could tell them where K.C. was, before also stating that when it was "over" and he had told them "everything," they would "be like, 'Fuck Travis.'" Appellant then denied killing K.C., but acknowledged she was no longer alive and said that she had died in his home in January 2021, allegedly after she threw herself into a door and

- 31 -

"just didn't get up." The jury was "entitled to weigh [appellant's] contradictory statements . . . and to infer that he was attempting to conceal his guilt by making [them]." *Iglesias v. Commonwealth*, 7 Va. App. 93, 110 (1988) (en banc) (citation omitted). Likewise, it did not have to believe his explanation of K.C.'s death and could "infer that he [was] trying to conceal his guilt," *Shackleford v. Commonwealth*, 262 Va. 196, 209 (2001), an inference made substantially stronger by Dr. Foster's testimony that a child of K.C.'s size could not cause her own death by throwing her head against a door or door frame.

Further incriminating himself in K.C.'s killing, appellant described to police how he struggled with K.C.'s behavioral issues, describing her as "almost like possessed" and how to try and manage her behavior, he had physically disciplined her, stating also that K.C. "liked to be smacked." He also told them that he had a "short temper," "might have lost [his] temper or something and smacked [K.C.]," agreed with them that when he took drugs, they would "turn" him and make him "lose [his] shit," and told them he had been "fucked up" on drugs "every day." Appellant also told police that in his home they might find K.C.'s blood traces "from a busted lip," but that there would be no traces "of significance." These statements were contradicted by the forensic evidence derived from multiple bloodstains across the walls and floors of K.C.'s bedroom. In its totality, this additional incriminating evidence demonstrated that appellant struggled with managing K.C.'s behavioral issues, used physical discipline on her by "smack[ing]" her, possessed a temper and would "lose [his] shit" when he took drugs, and sometimes "might have lost [his] temper" and struck K.C.

The jury could reasonably conclude that the only reasonable hypothesis flowing from all the evidence—including the photos and videos from Royer's phone, appellant's communications with Royer, and appellant's explanations and shifting accounts to police, together with the expert

medical testimony—was that appellant killed K.C.[9]  And Southern's testimony that appellant

confided in her his "big secret" that "he had murdered somebody," someone who was "close to

home, . . . local," provided additional support for this conclusion.  *Moseley*, 293 Va. at 463; *see*

*also Caison v. Commonwealth*, 52 Va. App. 423, 440 (2008) (noting that in a jury trial, a

witness's credibility and the weight accorded to their testimony are matters solely for the jury);

*Wright v. Minnicks*, 275 Va. 579, 585 (2008) ("It is also within the exclusive province of the jury

to draw any reasonable inferences from the evidence before it.").

### b.  Premeditation

Appellant next argues that even if the evidence was sufficient to prove that he was the

criminal agent responsible for K.C.'s death, there was "no evidence, circumstantial or otherwise,

to establish [his] specific, premeditated intent to kill [K.C.]"  Although he concedes that K.C.

"suffered abuse, neglect, and torture," he maintains that on this record, it is not possible to

"establish the [killer's] specific state of mind."

Conviction for aggravated murder under Code § 18.2-31(A)(12) requires proof beyond a

reasonable doubt that the killing at issue was "premeditated."  "To premeditate means to adopt a

specific intent to kill."  *Aldridge v. Commonwealth*, 44 Va. App. 618, 655 (2004) (quoting *Smith*

*v. Commonwealth*, 220 Va. 696, 700 (1980)) (discussing premeditation as an element required to

convict for first-degree murder under Code § 18.2-32).  "In other words, 'it is necessary that the

killing should have been done on purpose, and not by accident, or without design.'"  *Id.* (quoting

*Epperly v. Commonwealth*, 224 Va. 214, 231 (1992)).  But "'the intention to kill need not exist

for any specified length of time prior to the actual killing.'  Thus, '[a] design to kill may be

formed only a moment before the fatal act is committed provided the accused had time to think

---

[9] Although the Commonwealth was not required to disprove that Royer participated with
appellant in the killing of K.C., we note that appellant, as discussed above, told police that Royer
had "no involvement whatsoever" and that if he was "gonna burn" he would "burn by [him]self."

and did intend to kill.'" *Id.* (alteration in original) (citation omitted) (quoting *Clozza v. Commonwealth*, 228 Va. 124, 134 (1984)). "[W]hether the killing was . . . premeditated[] or accidental [is] a question of fact for the jury to determine from all the facts and circumstances." *Beavers v. Commonwealth*, 245 Va. 268, 281 (1993).

"Because 'premeditation and formation of an intent to kill seldom can be proved by direct evidence[,] [a] combination of circumstantial factors may be sufficient.'" *Fields v. Commonwealth*, 73 Va. App. 652, 674 (2021) (alterations in original) (quoting *Aldridge*, 44 Va. App. at 655). Circumstantial factors the jury may consider in determining if there is "sufficient evidence of premeditation and a specific intent to kill include: (1) the brutality of an attack; (2) the disparity in size and strength between the accused and the victim; (3) the concealment of the victim's body; and (4) the defendant's lack of remorse and efforts to avoid detection." *Aldridge*, 44 Va. App. at 655-56. And "although 'motive is not an essential element of the crime, it is relevant and often most persuasive upon the question of the actor's intent.'" *Id.* at 656 (quoting *Epperly*, 224 Va. at 232).

Here, in the January 12, 2021 video recorded shortly before her death, K.C. appeared, according to Dr. Foster, "very unhealthy," "very thin and malnourished," and "very weak." K.C.'s killer, appellant, a full-grown man, thus enjoyed a great disparity in size and strength between himself and his victim when he acted against K.C. Dr. Foster also testified that K.C. had been subject to child torture, comprising abuse and neglect, a fact that appellant concedes. According to Dr. Foster, the torture occurred in a context where typically "all of the caretakers . . . in that household" would "participate in it," fail to "take responsibility for what occurred," and "have very little remorse for what has happened to [the] child." Dr. Foster's interpretation of the photo and video evidence of K.C.'s life in appellant's home demonstrated that the torture there resulted in the infliction of great physical brutality upon K.C., manifested

by extensive bruises, abrasions, and other soft tissue injuries; loss of areas of hair; circular disruptions to K.C.'s skin that resembled "cigarette burns rather than abrasions"; and "impact trauma," including "loop marks or curvilinear marks" on K.C.'s back that indicated "something being used, like a cable cord . . . to hit the child." And police found in the home a looped wire handle wrapped with tape that bore hairs that were genetically almost uniquely associable with K.C. The jury could reasonably infer from this evidence that where such brutality was being directed at K.C. in her daily life, appellant's fatal attack on K.C. was likewise brutal, if not more so. Appellant also admitted to police that he acted to conceal K.C.'s body. And he both attempted to avoid detection by representing that K.C. was alive months after he had killed her, and demonstrated lack of remorse for her killing by bargaining knowledge of her whereabouts with police in hopes they would expedite his extradition. Lastly, the jury could reasonably infer appellant's motive to kill K.C. Appellant had a self-described "short temper"; would "lose [his] shit" while on drugs; struggled to manage K.C.'s behavioral issues, including through the employment of physical discipline like spanking, which "did no good"; and might "smack" K.C. after losing his temper. Considering the totality of this evidence and the reasonable inferences flowing from it, the jury could reasonably conclude that appellant's fatal act against K.C. was preceded by his specific intent to kill, even if formed only in a moment of anger immediately before his fatal act.

Because a rational trier of fact could have found the evidence sufficient that appellant was the criminal agent who killed K.C., and that he acted with premeditation, the jury did not err in convicting appellant of aggravated murder, in violation of Code § 18.2-31(A)(12). Accordingly, the trial court did not err, as alleged by appellant, in denying his motions to strike and to set aside the verdict.

## III.  CONCLUSION

For the foregoing reasons, the trial court did not err in admitting four social media communications or in denying appellant's motions to strike and to set aside verdicts of felony child abuse and aggravated murder.  And so we affirm appellant's convictions.

*Affirmed.*